# DECLARATION OF JESSE PILOTE

I, Jesse Pilote, hereby state the following to the best of my knowledge and belief, under penalty of perjury:

*Background of Declarant*

1.  I am a Task Force Officer with the Metro Nashville Airport Police Department, currently assigned to the Drug Enforcement Administration, Nashville Field Office. I have been a Task Force Officer since July 2009. During my tenure as a Task Force Officer for the Drug Enforcement Administration, I have been involved in hundreds of narcotics and drug-related investigations involving violations of international, federal, and state narcotics laws. I have authored and executed numerous federal and state search warrants and authored numerous federal and state affidavits for authorization for the interception of wire communications. Currently, I am responsible for investigating crimes that involve the unlawful importation and exportation of illegal narcotics, the possession with the intent to distribute controlled substances, the distribution of controlled substances, conspiracy, the use of communication facilities to further these offenses, the related crime of laundering monetary instruments, all in violation of Title 21, United States Code, Sections 841(a)(1), 843, 846 and 952, Title 18, United States Code, Sections 1956 and 1957, and structuring money to evade reporting requirements, in violation of Title 31, United States Code, Section 5324.

2.  Through these investigations, my training and experience, and conversations with other Agents, as well as other law enforcement personnel, I have become familiar with the methods used by narcotics traffickers to safeguard their illegal narcotics, to distribute narcotics, and to collect and launder the proceeds of narcotic sales. Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers operating at the local,

state, national and international levels, including those involving the distribution, storage, and transportation of illegal narcotics and the collection of money that constitutes the proceeds of narcotics-trafficking activities.

*Items sought for forfeiture*

3. I make this Declaration in support of a civil forfeiture complaint in rem seeking forfeiture of $25,508 United States currency.

*Source of Information*

4. The statements contained within this declaration are based on information obtained through my personal observations, training and experience, information gathered during interviews of Troy Lee Murphy, Jr., information obtained from airlines, discussions with law enforcement partners, and review of information and documents pertinent to this investigation. I have not included every item of information known to me concerning the Defendant Property and the facts surrounding this Declaration, but only those relevant to a determination that the Defendant Property is subject to forfeiture.

*Facts*

5. On July 14, 2022, the Nashville District Office Task Force Group 2, Airport Interdiction Group, was conducting airport interdiction efforts in the bag sorting area of Southwest Airlines at BNA.

6. At approximately 9:25 p.m., I and MNPD Sgt Brad Kessler located a locked, black roller bag, destined for Las Vegas on flight 2901. The bag tag showed the owners name as "Troy Leon Murphy Jr".

7. A Southwest Airlines employee in the area advised me and Sgt Kessler that they had smelled a strong odor of marijuana emanating from the bag when loading it. I and Sgt Kessler

both noticed the strong smell of marijuana emanating from the luggage as well.

8. Investigators utilized law enforcement databases to obtain a Tennessee Driver's License photograph of Troy Leon Murphy Jr. ("Murphy").

9. DEA TFO Matt Moore and MNAA Detective Chris Lueders and Detective Chris Swisher observed an individual, at gate C-7, that matched the description of the TN DL photograph of Murphy.

10. TFO Moore approached the individual, identified himself with his DEA credentials, and asked if the individual was Troy Leon Murphy Jr. Murphy confirmed that he was Troy Leon Murphy, Jr. Murphy later provided a TN DL matching the one obtained by law enforcement prior to making contact.

11. TFO Moore advised Murphy that investigators and airline employees noticed a strong smell of marijuana from his checked luggage.

12. Murphy stated that he had smoked marijuana earlier. Misunderstanding officers to be referring to the bag on his person, on his own Murphy opened his carry-on bag and showed investigators the contents.

13. TFO Moore observed several rubber banded bundles of United States Currency inside the bag.

14. TFO Moore explained to Murphy that he was referring to his checked bag and asked if Murphy Jr would give investigators, which were with the bag, consent to search, and Murphy Jr consented.

15. TFO Moore asked Murphy if there was U.S. Currency in the checked bag as well. Murphy stated that there was.

16. During the search of the checked bag, investigators observed one rubber banded

bundle of U.S. Currency inside the bag.

17. Upon questioning, Murphy stated that he did not know how much U.S. Currency was in his possession in total. Based upon my training and experience, this is consistent with money mule activity in that money mules are usually tasked with transporting cash supplied by others and do not know how much money they are transporting.

18. TFO Moore asked Murphy if he would accompany investigators to the MNAA office, to discuss outside of public view. Murphy agreed.

19. While in route to the MNAA office, investigators obtained a criminal history check of Murphy, which revealed the following arrests:

    a. 2011, Possession of a controlled substance;

    b. 2011, Possession of marijuana;

    c. 2012, Probation Violation;

    d. 2012, Probation Violation.

20. At approximately 9:37 p.m., investigators and Murphy arrived at the Airport Police Terminal office located at the South Checkpoint. TFO Moore informed Murphy that he was not under arrest or being detained. Murphy stated that he understood.

21. A more thorough search of Murphy checked luggage was conducted. Inside the checked bag there were towels and new, packaged clothing. Based upon my training and experience, is common for drug traffickers, couriers and money mules to pack towels to fill the void in the bag and make it seem full. It is also common, based upon my training and experience, for these individuals to pack new clothing to mitigate the odor of narcotics that may be on their previously worn clothing.

22. Murphy was in possession of deposit receipts for a Regions Bank account, both dated June 21, 2022. These receipts showed consecutive deposits of $5,500.00 at "9:53A", and then, subsequent deposit at "9:54A" for $10,000.00. These transactions, based upon my training and experience, are consistent with an effort to structure deposits to avoid transaction reporting requirements.

23. Murphy provided the following information in the interview:

    a. he had purchased his ticket to Las Vegas weeks ago;

    b. he was staying at the MGM Casino and was going to gamble;

    c. he goes to Las Vegas regularly for sports betting;

    d. the U.S. currency in his possession belongs to him and he did not withdraw it from any banks;

    e. he picked up the money from different individuals while on his way to the airport;

    f. he stated that he did not know who he picked up the money from;

    f. he later stated that he owned a beauty salon and that he received the money from employees that pay him "booth rent";

    g. he declined to provide names and phone numbers of the individuals that gave him money;

    h. 2700 D Gallatin, Pike was the address of the beauty salon/barber shop;

    i. Although a search on Google Maps for the business listed the business as "Permanently Closed," Murphy denied that it was closed;

    j. he did not know how much money he had picked up as "booth rent" and did not know how much money was in his possession at that time;

    k. he stated that he does not cut hair and only collects money from the barbers/stylist that rent the chairs at the building;

    l. he stated that he did not own the building;

- m. when questioned about his income and employment he stated that he owns, or is part owner, of several businesses;

- n. he could not recall his earnings claimed on his 2021 tax returns;

- o. aside from the beauty salon/barbershop mention above, he stated that he owned a trucking company and a marketing company;

- p. he later stated that he did not own the trucking company; however, he invested with an individual named Sam Henderson, in a company named Henderson & Logistics;

- q. Henderson & Logistics was only one tractor trailer that was privately owned by the driver and the company only acted as a dispatcher that obtains transport contracts;

- r. he stated that he only gave Henderson money and did not have any direct dealings with the inner workings of the company;

- s. he stated that the truck used by the company cost $50,000.00 and his contribution was $12-$13,000.00;

- t. Murphy could not explain how he earned an income from this investment;

- v. he further stated that he also runs a music management company called Muscle Marketing and Management;

- w. he books shows at nightclubs for artist but could not provide any details about past or future bookings;

- x. he stated that he was working on getting an LLC for the company;

24. TFO Moore informed Murphy that investigators wished to run a narcotic trained K-9 on the U.S. Currency separate from the luggage, and asked Murphy if he wished to observe the process. Murphy agreed.

25. Investigators placed the U. S. Currency in an unmarked box, and placed that box in an array of empty unmarked boxes.

26. MNPD Det. Lueders introduced his reliable, trained narcotics detection trained K-9 "Power" to the array of boxes, at which time Power indicated a positive alert for the odor of narcotics on the box containing the U.S. Currency.

27. Investigators later obtained information from Southwest Airlines on recent travel and bookings of Murphy. Murphy purchased his ticket to travel to Las Vegas (Flight 2901) on June 18, 2022, and that it was purchased as a one-way flight without a return. Records further showed that Murphy has a lengthy history of making one or two day trips to Las Vegas, Nevada and Atlanta, Georgia. Based upon my training and experience, this pattern of activity is consistent with courier or money mule activity moving drugs and drug proceeds. Further, Las Vegas is a known destination for money laundering activity. Based upon my training and experience, drug traffickers and money mules use gambling activity as a method of laundering proceeds to give the appearance of gambling winnings.

28. TFO Moore explained to Murphy that the U.S. currency was being seized as suspected drug-related funds and explained the federal seizure process.

29. Upon official count by Loomis, it was further determined to be $25,508.00 U.S. Currency.

30. Upon subsequent inquiry Murphy filed a sworn administrative claim to the Defendant Property claiming that the seized funds were gambling winnings. This is not consistent with his statement to law enforcement that the money came from "booth rent" or unidentified individuals he claimed gave him the money prior to his arrival at the airport.

*Conclusion*

31. Based upon this investigation and my training and experience, I believe the facts support a reasonable belief that the Defendant Property is moneys furnished or intended to be

furnished in exchange for a controlled substance, proceeds traceable to such an exchange, and/or moneys used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846 (drug trafficking).

32. The Defendant Property is therefore forfeitable to the United States pursuant to 21 U.S.C. §881(a)(6)

_____
JESSE PILOTE
Task Force Officer Drug Enforcement Administration